**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------X
JAMES P. CUMBERBATCH and            :
DAVID D. CUMBERBATCH,               :
                                    :
                 Plaintiffs,        :      03 Civ. 749 (BSJ)
          v.                        :
                                    :      <u>OPINION & ORDER</u>
PORT AUTHORITY OF NEW YORK AND      :
NEW JERSEY, THE CITY OF NEW YORK,   :
OFFICER POLIGOW, individually and in :
his Official Capacity as a Police   :
Officer of the Port Authority of New :
York and New Jersey, OFFICER SANTIAGO, :
individually and in his Official    :
Capacity as a Police Officer of the :
Port Authority of New York and      :
New Jersey, JOHN DOES, individually :
and their Official Capacities as New :
York City Police Officers and Port  :
Authority Police Officers,          :
                                    :
                 Defendants.        :
----------------------------------------X

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

<u>INTRODUCTION</u>

Plaintiffs Jaime and David Cumberbatch ("Jaime" and "David") allege that they were assaulted, battered, falsely arrested and later deprived of needed medical care in connection with a law enforcement incident.  In their complaint, they alleged 38 causes of action against the above-captioned defendants under 42 U.S.C. § 1983 and New York state law.  Some of those claims and defendants have already been dismissed.  The remaining defendants, which include The Port Authority of New York and New Jersey ("Port Authority"), Brett Poligow ("Officer

Poligow"), and William Santiago ("Officer Santiago"), now move for summary judgment as to the remaining claims against them. For the reasons below, the motion is GRANTED in part, and DENIED in part.

**BACKGROUND**

**A.    The Parties**

Plaintiffs Jaime and David are African-American males who, at the time of the incidents at issue, were 19 and 21 years of age, respectively.

Defendant Port Authority is a joint agency of New York and New Jersey created for the purpose of developing the port of New York.  N.Y. Unconsol. L. § 6451.  It operates, *inter alia*, the Port Authority Bus Terminal ("Terminal") in New York City.  It also operates a police force ("PA Police").  Officer Poligow and Officer Santiago (collectively, the "Officers") were at all relevant times officers of the PA police.  Certain additional, yet unidentified, PA Police officers are also named as "John Doe" defendants (collectively with Officers Poligow and Santiago, the "PA Officers").[1]

**B.    The Incident at Issue**

Plaintiffs alleged in their Complaint and testified in their respective depositions as follows.  On November 4, 2001,

---

[1] The City of New York and "John Doe" officers of the city's Police Department were also named in the Complaint.  By Order of Magistrate Judge Andrew J. Peck, dated May 1, 2003, they were dismissed as defendants, *see infra*.

Plaintiffs and a friend named Yachob Swinton ("Swinton") drove to the Terminal so that David could buy bus tickets which he and Swinton would use to return to Penn State University, where the two were enrolled.  They arrived at the Terminal shortly before 10:00 p.m.  Jaime, who was driving, stopped the car at the curb near the Terminal, and remained in the car while David entered the Terminal to buy bus tickets.

Officer Poligow soon approached the car and told Jaime that he was in a no standing zone, but could park across the street. Jaime drove a short distance down the block, made a U-turn, and remained there until another officer directed him to move, as he was now in a bus lane.  Jaime then made another U-turn and stopped his car for a third time, now back on the same side of the street where he had dropped David off, although further down the street.

Jaime waited a few minutes and then drove back up the block to where he expected his brother to exit the Terminal, which was also at or near the spot from where he originally was told to move.  There were approximately four or five other cars parked there as well.  Jaime saw David waiting at the door, and called to him.  Officer Poligow then approached again, said in substance "Didn't I tell you to move before?" and asked for Jaime's license and registration.

Jaime provided the requested documents to Officer Poligow. As he began to write a summons, the wind blew documents out of the Officer's hands.  Jaime left the car to retrieve the papers, but Officer Poligow told him to return to the vehicle, saying to Jaime, "You don't need them anyway."

After Jaime returned to the car, Officers Poligow and Santiago rushed towards Jaime and grabbed him, and he stood up. When Jaime asked what the problem was, the officers said "you're under arrest."  When Jaime asked what for, he never received a response, but Officer Poligow referred to Jaime as a wise guy and called for back up on his walkie-talkie.  Shortly after, several police officers appeared, who, along with Officers Poligow and Santiago, pulled and jumped on Jaime, even though he was not resisting.  At some point during the melee, Jaime was hit several times with fists and batons, kicked in the groin, and repeatedly sprayed in the eyes with pepper-spray.

Meanwhile, David asked Officer Poligow "what are you arresting my brother for?"  Officer Poligow then hit David in his chest several times, tackled David over the concrete barrier, handcuffed him, flipped him back over the barrier, and slammed him down to the street.  Several other PA Police officers then kicked David, whereupon his friend, Swinton, told the officers that David had a bad left leg.  In response, the

4

officers kicked David even harder, tauntingly asking him,
"Where's your pride now?"

Once Plaintiffs were subdued, their hands were cuffed
behind their backs and they were dragged and thrown into a PA
Police van.  As the van drove to the PA Police Precinct (the
"Precinct"), Jaime "cried out" in pain from the mace.  At the
Precinct, Jaime was handcuffed to a bench, where Plaintiffs
claim his continued requests for medical attention were met with
a reply by an officer that "they wanted him to 'marinate.'"
Despite his frequent requests for medical attention, Jaime
received none until at least an hour after the incident.

The brothers were taken from the Precinct to New York
Police Department Central Booking, where they were held.  Jaime
was charged with Trespass[2] under N.Y. Penal Law § 140.05, a
violation.  David was charged with Disorderly Conduct under N.Y.
Penal Law § 240.20, also a violation.[3]  They were arraigned and
then released on their own recognizance.  The brothers soon
after sought medical attention at a hospital's emergency room.

---

[2] Plaintiffs' papers incorrectly state that § 140.05 charges *Criminal*
Trespass.  That crime is actually charged under § 140.10 (3rd degree, a Class
B misdemeanor), § 140.15 (2nd degree, a Class A misdemeanor), or § 140.17
(1st degree, a Class D Felony).

[3]  Under the New York Penal Law, a violation is punishable upon conviction by
a sentence of not more than 15 days, and/or a fine.  *See* N.Y. Penal Law
§ 55.10(3).

Jaime and David claim that during the incident they received physical injuries, including bruises to their faces, abrasions and lacerations, some of which have caused permanent scars.  Both brothers claim to have suffered pain in their heads, faces, backs, arms, and legs, as well as "persistent" pain in their ribs, legs, and back.  In addition to physical injuries, Plaintiffs claim that they have suffered emotional injury, pain and suffering, mental anguish, humiliation, and embarrassment as a result of the incident.

Ultimately, the brothers accepted adjournments in contemplation of dismissal ("ACDs") of the charges against them.[4] The charges were dismissed on April 20, 2002.

---

[4]  N.Y. Crim. P. Law § 170.55 provides, in relevant part:

> An adjournment in contemplation of dismissal is an adjournment of the action without date ordered with a view to ultimate dismissal of the accusatory instrument in furtherance of justice.  Upon issuing such an order, the court must release the defendant on his own recognizance. . . .  If the case is not [] restored within [] six months or one year [because of, e.g., a further offense] . . ., the accusatory instrument is, at the expiration of such period, deemed to have been dismissed by the court in furtherance of justice.
>
> * * *
>
> The granting of an adjournment in contemplation of dismissal shall not be deemed to be a conviction or an admission of guilt. No person shall suffer any disability or forfeiture as a result of such an order.  Upon the dismissal of the accusatory instrument pursuant to this section, the arrest and prosecution shall be deemed a nullity and the defendant shall be restored, in contemplation of law, to the status he occupied before his arrest and prosecution.

NYCPL § 170.55(2), (8) (McKinney 2002).

### 2.    The PA Officers' Version

While the Court must accept Plaintiffs' version of the events as true for purposes of this motion, it bears noting that Officers Poligow and Santiago provided a very different account of the material events than that provided by Plaintiffs. According to the Officers' deposition testimony, after Jaime provided his identification and registration information, Jaime taunted the Officers with words and repeatedly exited the vehicle in disregard of the Officers' commands that he remain inside.  They perceived his actions as both threatening and a disturbance to the peace, and so determined to arrest him.  The Officers also assert that Jaime resisted arrest, and that escalating force was necessary to restrain him.  Such force included strikes to Jaime's limbs and the use of pepper-spray to his eyes.

Also according to Officer Poligow, David resisted his orders that he "stand back" while Jaime was being apprehended. When David did not back up, Officer Poligow perceived him as a threat.  Officer Poligow then used what he believed to be appropriate force against David, including pushing and punching him in the chest, dragging him to the ground, and handcuffing him.

The Officers also testified that the Plaintiffs were afforded timely and sufficient medical assistance.

**C.    The Complaint**

Plaintiffs filed their Complaint on February 3, 2003 --
almost 15 months after the incident in question.  The Complaint
asserted the following 38 causes of action, sounding under 42
U.S.C. § 1983[5] and New York State laws:

**1.    The § 1983 Claims**

- Assault through the use of objectively
  unreasonable force (claims 1 and 5, as
  against the PA Police Officers);[6]

- Denial of medical treatment (claims 2 and 6,
  as against the PA Police Officers);

- Arrest without probable cause (claims 3 and
  4, as against the PA Police Officers);

- Conspiracy to fabricate and fabrication of a
  claim of the events leading up to the
  arrests, resulting in false imprisonment
  (claims 7 and 8, as against the PA Police
  Officers);

- False statements under oath, resulting in
  false imprisonment (claims 9 and 10, as
  against Officer Poligow);

- Failure to intervene on Plaintiffs' behalf
  during the assault (claims 11 and 12, as
  against the PA Police Officers);

- Malicious prosecution (claims 13 and 14, as
  against the PA Police Officers);

- That *de facto* policies, practices and
  customs existed that condoned and fostered
  the conduct of the police officers (claims

---

[5] Section 1983 provides a statutory right of action for a person who has been
deprived of any federal "right[ ], privilege[ ] or immunit[y]" by a "person"
acting "under color of any statute, ordinance, regulation, custom, or usage
of any State."  42 U.S.C. § 1983.

[6] Except as otherwise noted, each pair of claims refers to Jaime and David,
respectively.

15 and 16, as against the City of New York
and the Port Authority, respectively); and

- Conspiracy to deprive Plaintiffs of their
  constitutional rights, (claims 27 and 28, as
  against the PA Police Officers).

### 2. New York State Law Claims

- Assault and battery (claims 17 and 18, as
  against the PA Police Officers);

- False arrest (claims 21 and 22, as against
  the PA Police Officers);

- False imprisonment, as against the PA Police
  Officers (claims 23 and 24, as against the
  PA Police Officers);

- Intentional infliction of emotional
  distress, (claims 25 and 26, as against the
  PA Police Officers);

- Negligent battery and negligent infliction
  of emotional distress (claims 29 and 30, as
  against the PA Police Officer);

- Negligent hiring, screening, retention,
  supervision and training (claims 31 and 33,
  brought by Jaime, as against the City of New
  York and the Port Authority; claims 32 and
  34, brought by David, as against the City of
  New York and the Port Authority); and

- Responsibility for the conduct of the police
  officers "pursuant to the state common law
  doctrine of respondeat superior" (claims 35
  and 37, brought by Jaime, as against the
  City of New York and the Port Authority;
  claims 36 and 38, brought by David, as
  against the City of New York and the Port
  Authority).

## D. Procedural History

The matter was assigned to me and referred to Magistrate

Judge Andrew J. Peck for general pre-trial purposes.  On May 1,

2003, Judge Peck dismissed the action, without prejudice, as

against the City of New York and all John Doe NYPD Officers, thereby disposing of claims 15, 31, 32, 35 and 36.  On June 19, 2003, Plaintiffs' malicious prosecution claims were, on consent, dismissed with prejudice, disposing of claims 13, 14, 19 and 20.

The remaining Defendants filed an Amended Answer on June 24, 2003, and discovery was taken.  The instant motion, filed by Defendants on April 27, 2005, seeks summary judgment on the remaining 29 claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact" and "may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial."  *Philips Credit Corp. v. Regent Health Group, Inc.*, 953 F. Supp. 482, 506 (S.D.N.Y. 1997) (citations omitted).  To defeat the motion, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).  Because summary judgment

10

searches the record, *See Bayway Refining Co. v. Oxygenated Marketing & Trading A.G.*, 215 F.3d 219, 225 (2d Cir. 2000), the parties' respective burdens may be supported by affidavits and declarations.  But in deciding the motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

### I.   STATUTE OF LIMITATIONS

As a threshold matter, Defendants maintain that: (1) all of Plaintiffs' state law claims against the Port Authority, and (2) the intentional tort claims against the individual officers, are time-barred.  The Court agrees, and for the reasons discussed below, claims 17, 18, 21, 22, 23, 33, 34, 37 and 38, are dismissed as untimely.  As also explained below, however, the state law negligence claims against the Officers and all of the § 1983 claims are timely.

#### A.   The Time-Barred Claims

##### 1.   The State Law Claims Against The Port Authority Are Time-Barred

In claims 33 and 34, Plaintiffs seek to hold the Port Authority liable for the acts of the PA Officers under a theory of negligent hiring, screening, retention, supervision and training.  Moreover, in claims 37 and 38, Plaintiffs seek to

hold the Port Authority liable for the acts of its officers under doctrine of respondeat superior.

Initially, it bears noting that under New York law, a plaintiff may not ordinarily plead respondeat superior and negligent hiring simultaneously. *See Coville v. Ryder Truck Rental, Inc.*, 817 N.Y.S.2d 179, 180, 30 A.D.3d 744 (3d Dep't 2006).[7]  In any event, neither of these claims may be maintained here, because they are time-barred.

While the New York statute of limitations for actions sounding in negligence generally is three years, *see* N.Y. C.P.L.R. § 214, a one year statute of limitations applies to all actions against the Port Authority, *see* N.Y. Unconsol. L. § 7107.[8]  The accrual of pendant state law tort claims in federal actions is governed by state law. *See, e.g.*, *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750-51 (1980).

---

[7]  A plaintiff may plead both simultaneously, and seek punitive damages, where he can show facts evincing gross negligence in the hiring or retention of an employee. *Coville*, 817 N.Y.S.2d at 180.  This requires a showing of conduct *in the hiring or retention* "that evidences a high degree of moral culpability, is so flagrant as to transcend simple carelessness, or constitutes willful or wanton negligence or recklessness so as to evince a conscious disregard for the rights of others." *Id.* (citing *Evans v. Stranger*, 762 N.Y.S.2d 678, 680, 307 A.D.2d 439, 440 (3d Dep't 2003)).

[8]  As explained in *Da Cruz v. Towmasters of New Jersey, Inc*:
> At common law, the Port Authority enjoyed sovereign immunity from suit.  In 1950, both New York and New Jersey passed legislation waiving the Port Authority's immunity, but conditioned that waiver as follows: "The foregoing consent is granted upon the condition that any suit, action or proceeding prosecuted or maintained under this act shall be commenced within one year after the cause of action therefore shall have accrued . . . ."

217 F.R.D. 126, 129 (E.D.N.Y. 2003) (quoting N.Y. Unconsol. L. § 7107) (citations omitted).

Here, the claims against the Port Authority accrued no
later than November 5, 2001.  The Complaint was filed nearly 15
months later, on February 3, 2003.  Thus, the state law claims
against the Port Authority -- claims 33, 34, 37 and 38 -- are
dismissed as time-barred.

> ### 2.  The Intentional Tort State Law Claims Against the PA Officers In Their Individual Capacities Are Time-Barred

In claims 17 and 18, Plaintiffs allege that they were
assaulted and battered by the PA Officers.  In claims 21 and 22,
Plaintiffs allege that they were falsely arrested.  In claims 23
and 24, they allege that they were falsely imprisoned.[9]  And in
claims 25 and 26, Plaintiffs allege that they were intentionally
inflicted with emotional distress.

All of these claims are intentional torts, subject to a one
year statute of limitations under New York law.  *See* N.Y.
C.P.L.R. 215(3).  There is no dispute that the claims accrued no
later than November 5, 2001.  *See, e.g.*, *Diallo v. City of New
York*, No. 95 Civ. 5483 (DC), 1996 WL 288240, at *2 (S.D.N.Y. May
31, 1996) (claims for false imprisonment, assault, battery, and
intentional infliction of emotional distress arising from
alleged law enforcement incident accrued on date of alleged

---

[9] Under New York law, claims for false imprisonment and false arrest are
treated the same.  *See Mitchell v. Home*, 377 F. Supp. 2d 361, 376 (S.D.N.Y.
2005) ("[A] cause of action for false arrest is essentially the same tort as
false imprisonment."); *accord Blanchfield v. State*, 427 N.Y.S.2d 682, 685,
104 Misc. 2d 21, 24 (1980).

incident).  Because the Complaint was filed more than one year
after the claims accrued, claims 17-18 and 21-26 are time-
barred.  *See id.*[10]

### B.   The Non-Time Barred Claims

#### 1.   The State Law Negligence Claims Against the PA Officers In Their Individual Capacities Are Timely

In claims 29 and 30, Plaintiffs assert claims against the
Officers for negligent infliction of emotional harm.[11]  This tort
is recognized under New York law, *see, e.g.*, *Sheila C. v.
Povich*, 781 N.Y.S.2d 342, 351, 11 A.D.3d 120, 130 (1st Dep't
2004), and carries a three year statute of limitations, *see* N.Y.
C.P.L.R. § 214; *Augeri v. Roman Catholic Diocese of Brooklyn*,
639 N.Y.S.2d 640, 641, 225 A.D.2d 1105, 1106 (4th Dep't 1996).

---

[10] Plaintiffs' argument to the contrary is entirely misplaced.  Specifically,
they rely on N.Y. C.P.L.R. 215(8)(a), which provides:

> Whenever it is shown that a *criminal action against the* same
> *defendant* has been commenced with respect to the event or
> occurrence from which a claim governed by this section arises,
> the plaintiff shall have at least *one year from the termination
> of the criminal action* as defined in section 1.20 of the criminal
> procedure law in which to commence the civil action,
> notwithstanding that the time in which to commence such action
> has already expired or has less than a year remaining.

N.Y. C.P.L.R. 215(8)(a) (emphasis added).  Plaintiffs mistakenly construe
this section to mean that the statute of limitations begins to run from the
time of the dismissal of *their* criminal actions, *i.e.*, April 20, 2002.  But
215(8)(a) extends the statute of limitations for civil claims brought against
a defendant -- not a plaintiff --- who was previously charged with a crime
arising from the conduct underlying the purported civil claim.

[11] To the extent that claims 29 and 30 assert claims for "negligent battery,"
they are not cognizable under New York Law, as there is no such offense.  *See
Lazaratos v. Ruiz*, No. 00 Civ. 2221 (BSJ), 2003 WL 22283832, at *6 (S.D.N.Y.
Sept. 30, 2003); *Schetzen v. Robotis*, 709 A.D.2d 193, 194, 273 A.D.2d 220,
221 (2d Dep't 2000).

Because the Complaint was filed within three years of the
incident, claims 29 and 30 for negligent infliction of emotional
harm are timely.[12]

### 2.   The § 1983 Claims Are Timely

In claims 1-15 and 27-28, Plaintiffs assert numerous
section 1983 violations based on various common-law theories of
liability.  "It is firmly established that New York's residual
statute of limitations of three years for personal injury
actions, CPLR § 214(5) . . . applies to federal civil rights
action under § 1983." *Lucas v. Novogratz*, No. 01 Civ. 5445
(GEL), 2002 WL 31844913, at *5 (S.D.N.Y. Dec. 18, 2002) (citing
*Owens v. Okure*, 488 U.S. 235, 249-51 (1989); *Eagleston v. Guido*,
41 F.3d 865, 871 (2d Cir.1994)).  Because the § 1983 claims were
brought within three years of the incident, they are timely.

## II.   THE § 1983 CLAIMS

Defendants maintain that all of the § 1983 claims against
them must be dismissed as a matter of law.  Section 1983
provides, in relevant part, that "[e]very person who, under
color of [state law], subjects, or causes to be subjected,
any . . . person within the jurisdiction [of the United States]

---

[12] While Defendants claim that these negligence claims may not coexist with
traditional intentional torts under New York law, *see Dorn v. Maffei*, 386 F.
Supp. 2d 479, 486 n.5 (S.D.N.Y. 2005) (claims for the infliction of emotional
distress must be dismissed where the conduct underlying the claim may be
addressed through traditional tort claims) (citing *Thomas v. County of
Putnam*, 262 F. Supp. 2d 241, 251 (S.D.N.Y. 2003)), there no longer is any
impermissible overlap here in light of the Court's dismissal of Plaintiffs'
state law intentional tort claims, *see supra* Point I.A.2.

to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the
party injured in an action at law" or a "suit in equity."  42
U.S.C. § 1983.  In order to establish § 1983 liability, a
plaintiff must demonstrate that: "(1) the defendant acted under
color of state law; and (2) as a result of the defendant's
actions, the plaintiff suffered a denial of [his] federal
statutory rights, or [his] constitutional rights or privileges."
*Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.
1998).  Here, Plaintiffs claim that their constitutional rights
under the Fourth and Fourteenth Amendment were violated.

For the reasons explained below, the § 1983 claim against
the Port Authority is dismissed.  Because genuine issues of
material fact exist as to the § 1983 claims against the
individual PA Officers, however, those claims survive summary
judgment.

**A.   The § 1983 Claim Against the Port Authority**

In claim 16, Plaintiffs seek to hold the Port Authority
directly liable for the alleged constitutional violations at
issue.  While a municipality may not be vicariously sued under
§ 1983 for injury inflicted solely by its non-policymaking
employees or agents, it may be directly held liable as a
"person" under 42 U.S.C. § 1983.  *See Monell v. Dep't of Social
Services of the City of New York*, 436 U.S. 658, 694 (1978).

16

"Although the Port Authority, a bi-state agency, is not technically a municipality, courts have treated it as such and have analyzed claims against it under the standards governing municipal liability under Section 1983." *Mack v. Port Authority of New York and New Jersey*, 225 F. Supp. 2d 376, 382 n.7 (S.D.N.Y. 2002). While the Port Authority is not a state agency for purposes of Eleventh Amendment immunity, when the Port Authority and its agents act in a law enforcement capacity, they act under "color of law" for purposes of § 1983. *See Turturro v. Continental Airlines*, 334 F. Supp. 2d 383, 392 (S.D.N.Y. 2004) (citing *Raysor v. Port Authority of New York and New Jersey*, 768 F.2d 34, 40 (2d Cir. 1985)).

"Claims against a municipality under § 1983 may proceed . . . only if 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or is conducted 'pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Ramos v. City of New York*, 05 Civ. 3155 (GEL), 2006 WL 2871969, at *2 (S.D.N.Y. Oct. 5, 2006)

(quoting *Monell*, 436 U.S. at 690-91); *accord City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).[13]

Here, the Complaint identifies no particular training, practice or policy that led to Plaintiffs' arrest or alleged mistreatment.  Rather, Plaintiffs aver the existence of "de facto" policies and customs, as evidenced by their allegations of being swarmed and beaten by numerous officers.  But this logic is entirely circular, and if permitted would expose the Port Authority to liability in every case where one or more of its employees is alleged to have done something wrong.  *See Ramos*, 2006 WL 2871969, at *2.  The absence of specific allegations of "what policy or custom led to the allegedly unconstitutional conduct" is fatal to Plaintiffs' § 1983 claim against the Port Authority.  *Id.; see also Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 159 (S.D.N.Y. 2006); (dismissing municipal liability claim because the complaint's "conclusory allegations" regarding the existence of a "de facto policy" was legally insufficient).  Accordingly, claim 16 -- which was the last remaining claim in this action against the Port Authority -- is dismissed.

---

[13]  It is well settled that a municipality cannot be held liable under § 1983 under a theory of respondeat superior or vicarious liability.  *See Canton v. Harris*, 489 U.S. 378, 385 (1989); *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), and Plaintiffs do not contend otherwise.

18

**B.   The § 1983 Claims Against the Officers**

Officers Poligow and Santiago seek dismissal of all the § 1983 claims against them on the ground that they are shielded from liability under the doctrine of qualified immunity.  For the reasons below, however, issues of material fact preclude the entry of summary judgment on these § 1983 claims.

**1.   Qualified Immunity**

The qualified immunity doctrine protects state actors sued in their individual capacities from a damages suit, where the defendant's actions did not violate clearly-established rights. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  In evaluating a claim of qualified immunity, this Court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation."  *Reynolds v. Goord*, No. 98 Civ. 6722 (DLC), 2000 WL 235278, at *7-8 (S.D.N.Y. Mar. 1, 2000) (citations omitted).  In general, a right is clearly established where: (1) the right in question was defined with reasonable specificity; (2) the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) under preexisting law a reasonable defendant

official would have understood that his or her acts were unlawful.  *See id.*

Because qualified immunity is "immunity from suit rather than a mere defense to liability," "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier*, 533 U.S. at 200 (citation omitted).  If such immunity applies, a dismissal of the plaintiff's claim, as a matter of law, is required.  However, a defense of qualified immunity cannot "deprive a plaintiff of his Seventh Amendment right to have a jury resolve all disputed issues of material fact." *Torres v. Village of Sleepy Hollow*, 379 F. Supp. 2d 478, 483 (S.D.N.Y. 2005).

### 2.   The Excessive Force Claims

In claims 1 and 5, Plaintiffs claim that their Fourth Amendment right was violated by the Officers' alleged use of excessive and unreasonable force during their arrests.  *See Graham v. Conner*, 490 U.S. 386, 395-96 (1989) (Fourth Amendment protects against the use of unreasonable or excessive force in connection with an arrest); *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002).  In the arrest context, the reasonableness inquiry turns on whether "the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Mickle*, 297 F.3d at 120 (citation omitted).
"[P]roper application [of this test] requires careful attention
to the facts and circumstances of each particular case,
including the severity of the crime at issue, whether the
suspect poses an immediate threat to the safety of the officers
or others, and whether he is actively resisting arrest or
attempting to evade arrest by flight." *Graham*, 490 U.S. at 396;
*accord Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

On a motion for summary judgment, the doctrine of
qualified immunity generally cannot shield a defendant charged
with the use of excessive force.  *See, e.g.*, *Robison v. Via*, 821
F.2d 913, 923-24 (2d Cir. 1987); *Brown v. City of New York*, No.
98 Civ. 5354 (ILG), 2001 WL 477279, at *7 (E.D.N.Y. Feb. 15,
2001); *Messina v. Mazzeo*, 854 F. Supp. 116, 133-34 (E.D.N.Y.
1994).  Apart from the fact that the rights asserted in such
cases are "clearly established," the issue of whether a
constitutional violation has occurred is generally a question of
fact, as one or more of the factors governing reasonableness
(*e.g.*, the threat posed, the amount of resistance, etc.) is
generally disputed.  *See, e.g.*, *Papineau*, 465 F.3d at 63; *Brown*,
2001 WL 477279, at *7.  That is precisely the case here.

For purposes of this motion for summary judgment, the Court
must accept Plaintiffs' version of the events at issue: namely,
that significant force was used against them notwithstanding

21

their lack of resistance.  That the Officers' version of the
events is markedly different cannot avail them at this stage in
the litigation.  *See Williams*, 428 F. Supp. 2d at 158 (denying
summary judgment of excessive force claim because "[t]he claim
has been adequately pled, and defendants cannot escape the
charges simply by alleging a different version of the
incident"); *Torres*, 379 F. Supp. 2d at 483 ("It is no defense to
a claim of qualified immunity that the defendant did not do what
plaintiff said he did.").  In short, it is for a jury to decide
whether excessive force was used.

    **3.   The Inadequate Medical Treatment Claims**

    For similar reasons, claims 2 and 6, for inadequate medical
treatment, must also go to a jury.  The Fourteenth Amendment's
due process clause protects a pretrial detainee against a state
actor's unreasonable deprivation of medical needs.  *See Bryant
v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991); *Messina*, 854 F.
Supp. at 139-40.  "In order to adequately plead a violation of a
. . . Fourteenth Amendment right to adequate medical care, the
plaintiff must allege action . . . which is, at the very least,
more than mere negligence, and, at the very most, a deliberate
indifference to plaintiff's medical needs."  *Messina*, 854 F.
Supp. at 140 (citing *Bryant*, 923 F.2d at 984).  "[P]roof of
intent is not required, because the deliberate indifference
standard 'is satisfied by something less than acts or omissions

for the very purpose of causing harm or with knowledge that harm will result.'"  *Brown*, 2001 WL 477279, at *8 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

Here, genuine issues of material fact exist as to whether the Officers intentionally delayed or hindered medical treatment to Jaime and David, for no other reason than to punish them or to make them suffer.  Contrary to Defendants' suggestion, the absence of a medical expert's opinion in this case is not at all fatal to Plaintiffs' claims.  *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony . . . . Expert testimony certainly could have bolstered [plaintiff's] case at trial, but the absence of such expert proof does not mandate dismissal of his action where the facts support a finding of deliberate indifference.").[14]  Thus, Plaintiffs' claims that they received inadequate medical treatment survive summary judgment.

### 4.    The Probable Cause Claims

In claims 3 and 4, Plaintiffs claim that they were falsely arrested and imprisoned without probable cause.  This claim arises from their Fourth Amendment right to be free from unreasonable seizures.  *See Weyant v. Okst*, 101 F.3d 845, 852

---

[14] "[A] pretrial detainee's [Fourteenth Amendment] due process rights to adequate medical treatment are at least as great as the Eighth Amendment protections available to prison inmates."  *Bryant*, 923 F.3d at 983 (citing *Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983)).

(2d Cir. 1996); *Golino v. City of New Haven*, 950 F.2d 864, 870
(2d Cir. 1991).  "In general, probable cause to arrest exists
when the officers have knowledge or reasonably trustworthy
information of facts and circumstances that are sufficient to
warrant a person of reasonable caution in the belief that the
person to be arrested has committed or is committing a crime.
*Weyant*, 101 F.3d at 852.  The existence of probable cause is
measured by the totality of the objective circumstances, to be
determined without regard to the arresting officer's subjective
beliefs.  *Williams*, 428 F. Supp. 2d at 154 (citations omitted).

     In the context of a qualified immunity defense -- which
affords state actors the constitutional benefit of the doubt --
something less than probable cause is required.  Specifically,
qualified immunity attaches not only if it was objectively
reasonable for the officer to believe that probable cause
existed, but also if "officers of reasonable competence could
disagree on whether the probable cause test was met."  *Golino*,
950 F.2d at 870; *see also Robison*, 821 F.2d at 921.  This so-
called "arguable probable cause" standard[15] recognizes that it is
"inevitable that law enforcement officials will in some cases
reasonably but mistakenly conclude that probable cause is
present, and . . . in such cases those officials -- like other
officials who act in ways they reasonably believe to be

---

[15] *See Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (using the term).

lawful -- should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Because the parties here sharply dispute the "totality of the circumstances" surrounding the brothers' arrests, summary judgment simply is not warranted. *See Weyant*, 101 F.3d at 855 (reversing district court's grant of summary judgment of § 1983 false arrest claim where issues of material facts existed as to existence of probable cause). While qualified immunity may provide a viable defense at trial, the Court cannot say, as a matter of law, that "arguable probable cause" to arrest Plaintiffs existed.

Apart from their qualified immunity defenses, the Officers contend that the disposition of Plaintiffs' charges by ACD provides an independent basis to dismiss Plaintiffs' false arrest claims, on the ground that an ACD is not a favorable termination. But this challenge is misplaced. While an ACD is relevant to a claim of *malicious prosecution*,[16] it is *not* relevant to a claim of *false arrest*. *See Freedman v. Monticello Police Dep't*, No. 01 Civ. 0119 (NRB), 2003 WL 135751, at **2-3 (S.D.N.Y. Jan. 17, 2003) (drawing distinction); *Sorensen v. City of New York*, Nos. 98 Civ. 3356 (HB), 98 Civ. 6725 (HB), 1999 WL 511923, at *2 (S.D.N.Y. Jul. 20, 1999) (same). The distinction

---

[16] *See Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980).

arises because, unlike a claim of malicious prosecution, a claim
for false arrest does not require a favorable termination.
*Weyant*, 101 F.3d at 854 (citations omitted).  Thus, the fact
that Plaintiffs' charges were terminated by ACD -- which is a
neutral termination, rather than a favorable one, *see Hollender
v. Trump Village Co-op., Inc.*, 448 N.E.2d 432, 434-35, 58 N.Y.2d
420, 424-25 (1983) -- in no way precludes their § 1983 false
arrest claims.  *See Freedman*, 2003 WL 135751, at *3; *Wedderburn
v. City of New York*, No. 00 Civ. 4027 (NRB), 2000 WL 1877100, at
*1 (S.D.N.Y. Dec. 27, 2000); *Coakley v. Jaffe*, 49 F. Supp. 2d
615, 624 (S.D.N.Y. 1999); *Sorensen*, 1999 WL 511923, at *2.[17]

### 5.   The Conspiracy Claims

In claims 27 and 28, Plaintiffs claim that the Officers
conspired to deprive Plaintiffs of their constitutional and
state law rights.  Conspiracy to deprive another of his
constitutional rights is actionable under § 1983.  *See Pangburn
v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  To state a

[17] Defendants reliance on *Roesch v. Otarola*, 980 F.2d 850 (2d Cir. 1994), is
misplaced, as that case did not involve the interpretation of New York law.
In *Roesch*, the Second Circuit held that a plaintiff's § 1983 false arrest
claim was barred because the criminal proceedings against the plaintiff had
been terminated pursuant to Connecticut's accelerated pretrial rehabilitation
program.  *Id.* at 853.  As the Second Circuit subsequently explained in
*Weyant*, however, the holding in *Roesch* does not extend to claims for false
arrest under New York law, which, unlike Connecticut law, does not require a
showing of favorable termination.  *Weyant*, 101 F.3d at 853 (quoting *Singer v.
Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("A favorable
termination of the proceedings is not an element of th[e] tort [of false
arrest].").  To the extent that some courts in this district have relied on
*Roesch* to bar false arrest claims on the basis of an ACD, *see Bowles v. New
York*, 37 F. Supp. 2d 608, 611-12 (S.D.N.Y. 1999); *Copeland v. City of New
York*, No. 99 Civ. 2191 (HB), 1999 WL 1201737, at *2 (S.D.N.Y. Dec. 14, 1999),
those decisions do not reference, and are squarely at odds with, *Weyant*.

§ 1983 conspiracy claim a plaintiff must allege:  "(1) an
agreement between two or more state actors or between a state
actor and a private entity; (2) to act in concert to inflict an
unconstitutional injury; and (3) an overt act done in
furtherance of that goal causing damages."  *Id.; accord
Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir.
2002).

As Defendants point out, mere conclusory allegations of a
§ 1983 conspiracy are insufficient.  *See Dwares*, 985 F.2d at 99-
100 (citing cases).  Plaintiffs provide more than that here,
however.  They allege that the PA Officers agreed to, and did,
assault and falsely arrest them, in violation of their rights
under the Fourth and Fourteenth Amendments.  Whether that can be
proved at trial remains to be seen.  But for now, the claims as
alleged are sufficient.

**6.  The Remaining Miscellaneous § 1983 Claims**

Claims 9-12 will be consolidated with other claims, and
will no longer be considered independently.  Specifically,
claims 9 and 10, concerning the making of false statements under
oath, is not a separately cognizable claim under § 1983.  Thus,
the Court will consider the allegations Plaintiffs make in
claims 9 and 10 as factual support for their allegation of
conspiracy in claims 27 and 28.  Claims 11 and 12, which allege
that the Officers' failed to intervene on Plaintiffs' behalf,

cannot logically be pled against the same Defendants simultaneously with claims 1 and 5, which allege assault.[18]   The Court will thus construe these claims as pleading in the alternative, and on that basis will incorporate them into claims 1 and 5 -- *i.e.*, the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.

## CONCLUSION

For the foregoing reasons, the Court (1) GRANTS Defendants' motion for summary judgment as to claims 16-18, 21-26, 33-34, and 37-38; (2) DENIES summary judgment as to claims 1-8 and 27-30 and (3) consolidates claims 9-12 into other surviving claims.

The parties are directed to file a joint pre-trial order by January 29, 2007, and be ready for trial on March 6, 2007.

**SO ORDERED:**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:      December 5, 2006
            New York, New York

---

[18] "A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers," and may be held liable under § 1983 for failing to intervene. *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 129 (2d Cir. 1997) (citation omitted).

28